**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **JANE DOE** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **KATY INDEPENDENT SCHOOL** | § | |
| **DISTRICT, a Texas Independent School** | § | **CIVIL ACTION NO. 4:17-cv-1060** |
| **District, et al** | § | |
| **Defendants.** | § | |
| | § | |
| | § | |
| | § | |
| | § | |

**PLAINTIFF'S RESPONSE TO THE KATY INDEPENDENT SCHOOL DISTRICT'S**
**MOTION FOR SUMMARY JUDGMENT**

Respectfully submitted,

Mr. Martin J. Cirkiel, Esq.
State Bar No.: 00783829
Fed ID No.  21488
Cirkiel & Associates, P.C.
1901 E. Palm Valley Boulevard
Round Rock, Texas  78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]

Mr. Joshua A. Verde
Attorney-in-charge
State Bar No. 24077590
Fed ID No. 1760723
The Verde Law Firm, PLLC
4600 Highway 6 North, Suite 320
Houston, TX 77084
(713) 909-4347 [Telephone]
(713) 588-2431 [Facsimile]
josh@verde-law.com [Email]

ATTORNEYS FOR PLAINTIFF
JANE DOE

TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . I

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I.      STATEMENT OF THE CASE AND BRIEF RESPONSE . . . . . . . . . . . . . . . . . . . . . . 1

II.     EVIDENCE CONSIDERED   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

IV.     STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V.      SUMMARY OF DEFENDANT'S ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

VI.     ARGUMENT AND AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

VII.    CONCLUSION AND PRAYER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VIII.   CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## TABLE OF AUTHORITIES

**Federal Cases**

### Supreme Court Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . 13, 25

Davis v. Monroe County Board Of Ed., 526 U.S. 629 (1999) . . . . . . . . . . . . . . . . . . . . . 17 19, 21

Gebser v. Lago Vista Independent School District, 524 U.S. 274, 291-292 (1998) . . . . . . Passim

Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) . . . . . . . . . . . . . . . . 13

### Courts Of Appeal

Audler v. CBC Innovis Inc., 519 F.3d 239 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Baynard, v. Malone, 268 F.3d 228, 238 n. 9 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

City Nat'l Bank of Ft. Smith, Ark. v. Vanderboom, 422 F2d 221 (8th Cir. 1970) . . . . . . . . . . . 14

Escue v. N. Okla. College, 450 F.3d 1146, 1154 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . 20

Gonzalez v Yseleta Indep. Sch. Dist., 996 F.2d 745, 761 (5th Cir. 1993) . . . . . . . . . . . . . . . 22, 24

Jones v. City of Chicago, 856 F.2d 985, 992-993 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . 22

L&A Contracting v. Souther Concrete Services, 17 F.3d 106, 113 (5th Cir. 1994) . . . . . . . . . . 25

P.H. v. School District of Kansas City, Missouri, 265 F. 3d 653 (8th Cir. 2001) . . . . . . . . 15, 24

Pourghoraishi v. Flying J, Inc., 449 F.3d 751 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Simpson v. University of Colorado, 500 F.3d 1170 (10th Cir. 2007) . . . . . . . . . . . . . . . . . 1, 21, 22

Smoot v. Chicago, R. I. & P., Co., 378 F.2d 879 (10th Cir. 1967) . . . . . . . . . . . . . . . . . . . . . . . 14

Vance v. Spencer Cnty. Pub. Sch. Dist., 231 F3d 253, 261 (6th Cir. 2000) . . . . . . . . . . . . . . . . 25

Williams v. Bd. Regents Univ. Sys. Ga., 477 F.3d 1282, 1296 (11th Cir. 2007) . . . . . . . 20, 22, 23

**District Ca ses**

D.A. v. Meridian School District No. 2, 289 F.R.D. 614, 631 (D. Idaho 2013)  . . . . . . . . . . . . . 25

Doe v. University of Tennessee, 181 F. Supp. 3d 788 (M.D. Tenn., May 3, 2016)  . . . . . . . 21, 24

Hernandez v. Baylor Univ., 2017 U.S. Dist. LEXIS 54255* (W.D. Tex., April 7, 2017)  . . . 20, 21

K.M. Ex el D.G. v. Hyde Park Cen. Sch. Dist., 381 F. Supp.2d 343, 348 (S.D. N.Y. 2005) . . . . 25

**Federal Statutes & Rules**

20 U.S.C. §1681 (Title IX) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Passim

Fed. R. Civ. P. 12(b)(6)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**PLAINTIFF'S RESPONSE TO THE KATY INDEPENDENT SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT**

COMES NOW, Plaintiff JANE DOE (a pseudonym, hereinafter "Doe") by and through her attorneys of record, Joshua A. Verde of The Verde Law Firm, PLLC, and Martin J. Cirkiel, with the Law Firm of Cirkiel & Associates, P.C., files this her *Response To The Katy Independent School District's Motion For Summary Judgment* ("the Motion") [hereinafter referred to as "KISD", or "The School District"] and does hereby respond as follows:

## I. STATEMENT OF THE CASE AND BRIEF RESPONSE

1. It is uncontroverted that Robert Milton, a teacher at the Katy High School had a sexual relationship with a female student, Jane Doe. As such, she has brought a claim against the School District, pursuant to Title IX of the Educational Acts of 1972. In their *Motion For Summary Judgment*, the District argues, among other things, that because they did not have actual notice of the relationship until after it had stopped, they can't be held liable for Milton's acts. They rely upon Gebser v. Lago Vista Indep. School District, 524 U.S. 274 (1998) for this proposition. In *Response* Doe notes Gebser equally stands for the proposition that a District can be held liable under Title IX when the claim is not based upon sexual harassment of one individual but the deliberate indifference of the institution itself, Id. at 290, as such indifference can cause female students to have a *heightended risk* to sexual harassment, Simpson v. University of Colorado, 500 F.3d 1170 (10th Cir. 2007). As Doe has provided contested issues of material fact as to whether or not the School District created an environment was hostile to females like herself, the School District's *Motion For Summary Judgment* should be denied and the case be permitted to proceed to trial.

## II.  <u>EVIDENCE CONSIDERED</u>

2.      Plaintiff relies upon the statements provided by the Defendant in their own pleadings which is deemed admitted and is self-authenticated. *See also* FED. R. CIV. P. 26.  Further, Plaintiff relies upon all the *Exhibits* provided in *Defendant's Motion For Summary Judgment* [DE# 58], all as set forth and fully incorporated herein. As Defendant has only provided portions of the depositions in some instances, Plaintiffs provide the following: Exh. A., Deposition of Kelly (Booth) Colopy; Exh. B., Deposition of Kevin Colopy;  Exh. C., Deposition of Doe; Exh. D., Declaration of Geir Bentzen with Exhibits attached; and Exh. E., Declaration of Kevin Colopy; all incorporated herein as if fully set forth.

## III.  <u>FACTUAL BACKGROUND</u>

A.      PRINCIPAL MARY JANE CROWE ENFORCED A CONSPIRACY OF SILENCE WHEN IT CAME TO ADDRESSING COMPLAINTS OF TEACHER MISCONDUCT

3.      It is uncontroverted that all times relevant to this complaint, Mr. O.D. Tompkins was the Principal at the Mayde Creek High School, within the Katy Independent School District catchment area. Mrs. Mary Jane Crowe was the Grade Principal for Jackie (a pseudonym) a student at the high school.  All the persons named in this and the next section are from or involved with the Mayde High School. In the Spring of 2001, an Art Teacher named Kelly Booth[1] observed that Mr. Cantu, an Art Teacher at the school, was taking students off-campus without permission to do so.  Knowing that this was a violation of school policy, she complained to Mary Jane Crowe, an Assistant Principal at the Mayde High School (and wife of the then acting Superintendent). [Exh. A, p. 34, l. 12-21].  Crowe became "ballistic" and

---

[1]. Since that time she married Kevin Colopy, then a substitute teacher at the school and has taken on his last name.

told Kelly to mind her own business.  Kelly reports she felt like she was "raked over the coals" for complaining about another teacher and was taught a valuable lesson, to mind her own business and keep her mouth shut. [Exh. A, p. 18, l. 12-25]. When she left the room, Kelly was crying.  The entire experience made a big impact on her. [Exh. A, p. 30, l. 6-12].

B.    ART TEACHER KELLY BOOTH OBSERVED MISCONDUCT BETWEEN ANOTHER ART TEACHER, ROBERT MILTON, AND A FEMALE STUDENT

4.    The following year Kelly's room was next to Robert Milton, an Art Teacher. The rooms were connected and she could see in his room. Early in the Fall of 2001, she noticed that a female student named Jackie was "always there" and alone with him. [Exh. A, p. 32, l. 9-18].  She heard a lot of giggling between the two and observed them flirting with each other, looking into each other's eyes, running circles around the classroom and playing "grab ass." This happened during a conference period, when school policy was that no one was to be in the classroom, except the teacher. [Exh. A, p. 10, l. 1-25; p. 23, l. 18-21].

5.    Over the course of time, Kelly observed that the classroom changed.  For instance, Milton took off his wedding ring, took down pictures in the classroom of his wife LeAnne, an elementary school teacher in the District [Exh. A, p. 16, l. 13-14] and replaced them with pictures art of Jackie.  Soon Jackie started wearing Milton's art smock. Of course, all the students in the class observed all these changes.  Someone must have complained because on one occasion,  Principal Tompkins came to the classroom and had Jackie remove the shirt. [Exh. A, p. 11, l. 21-25; p. 12, l. 6-9].  Kelly thought the visit by the Principal would have an effect upon Milton, but it did not because Jackie continued to be in the room both before school and after school.  [Exh. A, p. 13, l. 15-20].

6.    Kelly was so upset she told LeAnne Milton her pictures in the classroom were gone and

Jackie was wearing her husband's wedding ring.  The next day Milton spoke with Kelly and was livid- apparently his wife had told him what was said. [Exh. A, p. 13, l. 20-25; p. 14, l. 1-8].    She also shared her concerns about Milton and Jackie with Mickey Trainer, a Department Head [Exh. A, p. 16, l. 22-23; p. 17, l. 10-15] and Kevin Colopy, then a Substitute Art Teacher.  She didn't tell anyone else because the year before, Crowe made it very clear for her to mind her own business. [Exh. A, p. 18, l. 7-25].

7.    Kelly reports at a school Art Contest there was a lot of student participation but little from Milton's classes. Principal Crowe observed and said, more or less, "Well I can see who's really doing their work around in the Art Department." In response, Kelly said "Well someone's really distracted." Crowe gave Kelly "the evil eye," a look with the same message as the year before, "mind your own business." Kelly didn't say another word. [Exh. A, p. 19, l. 12-24].   Later in the school year and at a different Art Show, Milton presented a piece of his work, a picture of a woman that beheaded. Kelly again noted her concerns with Crowe about Milton, but Crowe did not acknowledge this troubling issue. [Exh. A, p. 21, l. 4-17].

C.    PRINCIPAL CROWE ENFORCED THIS CONSPIRACY OF SILENCE WHEN LEARNING THAT ROBERT MILTON, AN ART TEACHER AT THE HIGH SCHOOL, WAS ENGAGED IN MISCONDUCT WITH A FEMALE STUDENT

8.    At the time integral to this case, Kevin Colopy was a long-time substitute Art Teacher at the Madye High School.   His mother, Glenda Konopy was also a teacher at the same school. [Exh. B, p. 9, l. 18-25].   On one occasion Kevin opened a door and saw Milton embracing Jackie from behind.  He was outraged and "told everybody" as admittedly he has a "big mouth."   Kevin specifically remembers telling his mother, Kelly, Dorothy Madinka, a photography teacher, the Department Head, Mickey Trainer and "a lot of people." [Exh. B,

p. 10, l. 12-25; p. 11, l. 1-8]. He spoke with no one else about his concerns until he observed another even more alarming incident. [Exh. B, p. 11, l. 9-21].

9.   On occasion Kevin substituted for Milton.  On one occasion he observed Milton and Jackie in the back seat of Milton's car, just outside the teacher's parking lot, with him on top of her, embracing and his head buried into her neck. Kevin remembers thinking it odd because Milton was absent from school that day.  At some point Jackie left the car and returned to the school. [Exh. B, p. 12, l. 1-25].  The following Monday he confronted Milton, who told him "it's none of your f__ cking business." [Exh. B, p. 13, l. 19-25].  Kevin immediately went to report what he observed to Grade Principal Mary Crowe and told her he observed Milton in a "couple of situations that don't look good." [Exh. B, p. 14, l. 11-16].  In retrospect he realized that the many times that Milton asked him to substitute for him coincided with Jackie also missing school. [Exh. B, p. 24, l. 1-7].

10.   Kevin also told Crowe that he observed Milton and Jackie eating lunch alone in the classroom, which he knew was also inappropriate and that he was having an inappropriate relationship with female students. [Exh. E, ¶1-10]. He also saw Milton put his hand on her head many times. Crowe let Kevin know "in no uncertain terms" to keep his mouth shut or he would no longer work in the school. [Exh. B, p. 15, l. 4-10; p. 16, l. 1-6]   He was so "pissed off" that he called the office of the Administrator for Substitute Teachers.  He gave a statement to someone on the phone but was never contacted by anyone after that.  [Exh. B, p. 15, l. 12-19]. Even though he complained to two school officials, Crowe and the Administrator, nothing was done, as Milton and Jackie's behaviors continued. In fact, on a variety of occasions he observed Jackie wearing Milton's art shirt. He complained to another

teacher that someone needs to question Milton because what was going on was clearly inappropriate. [Exh. B, p. 16, l. 3-14].

11.  Crowe found out and pulled Kevin aside and asked him if he had been speaking about Milton and Jackie.  He admitted, that he had been doing so.  On the way out of the building Kevin Colopy walked into a room with over a hundred persons, including many, many teachers and yelled out towards Milton "you are a f __ king pedophile, (you) should be ashamed of yourself." On that same day Kevin was terminated by a female Administrator because of what he had said in front of all the students and teachers. [Exh. B, p. 16, l. 15-25; p. 17, l. 3-16; p. 24, l. 1-11; p. 25, L. 13-25].

12.  Within days Milton had easily transferred to the Katy High School as there was no written record of the complaint filed by Kevin Colopy, or an investigation for embezzling [DE# 58-8, p. 24/28, l. 11-23] or that he presented at a School Art Fair with a painting of a woman who was beheaded.  It is uncontroverted that Milton was not put on any type of *Improvement or Disciplinary Plan* to address the complaints received by Konopy or anyone else for that matter. He was never put on a plan that provided any corrective measure. He as not required to take additional training.  He was not required to receive additional supervision. Neither was he reported to appropriate authorities in the criminal justice system.  Neither was he  reported to appropriate authorities with Texas Education Agency *State Board Of Educator Certification*. [DE# 584, p. 33/35].  Not surprisingly, having survived the Mayde Creek High School period unscathed, Milton's next victims of sexual exploitation, sexual harassment and assault were soon to be at his new place of employment, the Katy High School.

D.    NEW ALLEGATIONS AGAINST MILTON AT THE KATY HIGH SCHOOL IN 2010 GO
      WITHOUT INVESTIGATION

13.   Geir Bentzen ("Bentzen") was a Spanish teacher at Katy High School from 2008 to 2010.

      During the Spring semester in 2010, four of Bentzen's female students who took art reported

      to him on multiple occasions that Milton was touching their shoulders and neck while walking

      around the classroom and making them very uncomfortable. Based on the reports of the

      female students, he told them to filed complaints with their respective grade principals. [Exh.

      D; DE# 58-7, p. 8, l. 13-18; p. 9, l. 1-22; p. 10, l. 3-7; p. 11, l. 10-12].

14.   Knowing he had a strong obligation to do so, he definitely reported his concerns to a School

      Official. He believes it was likely Scott Rounds, the High School Assistant Principal at the

      time but in his deposition Rounds stated he never received such a complaint. [Exh. D; DE#

      58-7, p. 14/34, l. 4-15]. In any case, whoever did receive the complaint did nothing about it

      [DE# 58-7, p. 21/34, l. 16-18], just like Crowe and the previous administrators who received

      complaints about Milton. He knows that he was never questioned or required to write a

      written statement or to his knowledge that any female student was required to do so.

E.    MILTON STARTS GROOMING DOE IN 2011

15.   In 2011 Doe was 14 years old, and she was beginning her freshman year at Katy High School.

      As a freshman and sophomore at Katy High School, Doe knew Milton as an art teacher

      through class and school-sponsored activities. During Art Class he would often show the class

      nude sculptures and artworks even though there were many other works from those artists he

      could have used to talk about. As he had been doing for years, Milton would frequently talk

      about the human body and sex. Doe notes that many of the students would talk about being

      uncomfortable about some of the art being used. [DE# 38, ¶96-98].

F.      THERE ARE ALLEGATIONS OF MISCONDUCT BY MILTON, NOW IN 2012

16.     An Art Teacher at the Katy High School, Laura Ann Williams, noticed that every day at lunchtime a female student went to Milton's classroom.  They were always there alone.  This was not her only concern though.  On one occasion she was looking through the student's art portfolio and noticed some drawings that were concerning. Specifically, there was a drawing of a young girl who was nude, sitting on a man's lap.  Williams was concerned and about the situation and discussed her concerns, with a former Katy HS librarian, Robin Cashman, now working at the Wood Creek Elementary School. [DE# 58-4, p. 12/35].

17.     In and around April of 2012 Cashman called Debbie Davis, the Katy HS Secretary and let her know ("she heard it through the grapevine") that there were rampant rumors ("juicy gossip")[2] that Milton was having lunch every day and alone, with another young female student, named Becky (a pseudonym). [DE# 58-4, p. 12/35].  In any case, she reported the allegations to the School Principal, Dr. Steve Robinson. Over the course of now a better part of a decade, and dealing with likely close to a dozen people, Davis was the only person who fulfilled her statutory, professional ethics and duties under the school board policies and procedures. Robinson did get in touch with the District's Human Resources Office which began an investigation. Milton was put on Administrative Leave and for the first time was given some administrative oversight. [DE# 58-4; p. 2/35, ¶2, p. 5/35].

18.     Robinson contacted the Katy ISD Police who investigated the allegations.  The P.D., looking at the issue from a potential penal code violation perspective, interviewed Robin Cashman, the Librarian; Lisa Matschek and Laura Williams, both Art Teachers. Williams who told them

---

[2].  This infers that other teachers were also knowledgeable about the allegations and failed to report it also.

of her concerns when she looked in the student's portfolio, she observed a picture of a nude female that did not appear to be drawn by the student but by Milton. She also noticed the student and Milton were alone in his room for lunch every day. Williams called Robin Cashman.  In doing so, she too, like all of the other persons who had suspicions about Milton wanted it kept secret and "did not mean for the information to get back to the administration of the school."   They also spoke with the student who was the object of the complaint.  [DE# 58, p. 11-12/32; 58-4, p. 12-15, 22/35].

19.     The School District Human Resources Department also investigated the investigations. They interviewed the student and her mother.  They never questioned Robert Milton or any of the other persons who were involved complaint process, rather they relied upon the Police Investigation. Milton was admonished for having poor judgment, and in the future to follow district procedures regarding tutorials, i.e. having students alone in the classroom. [DE# 58, p. 12-32/32]. Nevertheless, in the summer of 2012 Milton was permitted to take a group of students to Italy. (DE# 58-4, 28/35).

20.     Once again, Milton was "left off the hook" and was further emboldened as he was permitted to return to teaching without any disciplinary or improvement plan in place.  No additional supervision, no extra training, no reporting, nothing.  It should come as no surprise that shortly thereafter, and in 2012, Milton, focused his *grooming techniques* again, this time on Doe and started his now *tried and true,* inappropriate, illicit and unethical emotional and sexual advances toward her. [DE# 38, ¶93-95].

G.     THERE WAS FREQUENT MISCONDUCT BETWEEN MILTON AND DOE

21.     Doe turned eighteen years old on October 23, 2014 when she was senior at the Katy HS. [DE#

58, p. 7/32].  Doe remembered that during art class Milton would show the class nude

sculptures and nude artwork, making some students very uncomfortable, especially in the way

he spoke about the nude body. He would tend to "over-sexualize male and female stuff" and

would make sexually suggestive jokes [Exh. C, p. 16, l. 8-10] and talk about the "self-

destructive behaviors of artists. He commented that some parents had complained to him

about the issue.  [Exh. C, p. 12, l. 21-25; p. 13, l. 1-25; p. 14, l. 1-5].

22.    Over the course of time, Milton approached Doe in an overtly friendly and flirtatious manner

mostly through Instagram and text messaging on an hourly basis. [DE# 58, p. 8/32; 58-6, p.

9/27, l. 12-13].   By her junior year an emotional relationship had started.  He started to tell

Doe about issues with his wife and marriage. [Exh. C, p. 15, l. 9-11; p. 17, l. 1-3].   Once Doe

turned eighteen, their relationship intensified. And he started sending very explicit and graphic

photographs and videos.  [Exh. C, p. 17, l. 9-16; p. 31, l. 11-19].

23.    Not surprisingly, over the course of time, these activities made Doe more and more

comfortable with the use of nude images for her art work (as Milton did with the previous

student).  At one point, before they actually had a romantic and sexual relationship, Milton

began to push the idea of Doe painting herself naked, so she did so, making two nude

paintings of herself for class. He began to give her notes, saying he loved her.  He gave her

a book of all his photography works. [Exh. C, p. 18, l. 14-22; p. 26, l. 21-25; 26, l. 1-4; 2-21].

Sometimes she would go to his class and he would pull her into a side storage closet in his

classroom where they would kiss and touch each other. [Exh. C, p. 29, l. 1].

24.    On one occasion Doe was in a meeting with Milton and another Art Teacher, Ms. Rodriguez,

who commented as to observing Milton and Doe communicating nonverbally, with their eyes

and other mannerisms, simulating sexual intercourse, as a couple romantically involved would do. Doe believes Rodriguez "picked up on it" but was friends with Milton. [DE# 58-6, p. 7/27; l. 3-12; p. 8., l. 1-25]. Once again the Katy ISD Staff failed to report their concerns and Defendant did nothing to address these serious concerns.

25.     In early 2015, still during her senior year of high school, Doe scheduled senior photos with Milton at the Houston sculpture garden at Milton's request. Milton was an amateur photographer, in addition to being a teacher. At the sculpture garden, Milton used his influence to force himself on Doe physically – kissing, touching, and penetrating her vagina with his fingers and her stroking his penis. [DE# 58-1, p. 3/11; 58-2, p. 2/3; 58-3].

26.     Milton would pay for motels in which they would meet and have sex after school. [Exh. C, p. 39, l. 9-20]. On other occasions he would pick Doe up from school and they would have for sex in his car. Doe confided in a friend about the relationship before she graduated from the Katy High School in June of 2015. She soon started college outside of Texas. This emotional and sexual relationship that began while Doe was a student at Katy High School [DE# 58, p. 9/32] continued after her graduation. In fact, Doe went on a trip to Europe with Milton and other students and had sex with hin in his private room. [DE# 58-2, p. 2/3].

27.     They communicated via Instagram and Facebook. [DE# 58-2, p. 2/3]. Milton's text messages to her were inappropriate at the outset, but later crossed into grossly inappropriate. In fact, after Doe graduated and was in college Milton "sexted" Doe with photos of his penis, and being naked and masturbating. When Doe realized that she had been manipulated by Milton, and the extent of his manipulation in furthering the inappropriate relationship, she ended the relationship with him. She also began to feel the gravity and reality of the situation and was

traumatized by that realization and told her mother. [DE# 38, ¶96, 112-14; 58, p. 7/32].

28.    Doe reported the events to her parents. [DE# 58, p. 8/32]. When Doe's parents reported her abuse to school administrators and insisted on action, Katy ISD could no longer conceal Milton's actions or protect him.   Faced with evidence of a crime, Katy ISD was left with no choice but to cease their efforts to conceal the conduct of Milton that had persisted for years. In an interview Milton admitted he had not accounted for monies given to him correctly and had used district resources for his private photography business. Also that took students off campus when taking their photographs. [DE# 58, p. 9/32; 58-2, p. 2-3/3]. They reported his most recent criminal conduct to the law enforcement. Milton was arrested and/or surrendered and was charged with an improper relationship with a student. [DE# 58, p. 10/32].  Milton resigned from Katy High School/Katy ISD in July of 2016 after the relationships were revealed.  Milton was charged with the felony of improper relationship with a student on July 28, 2016.  Milton entered a guilty plea on November 22, 2016 and accepted a deferred adjudication for a term of four (4) years.  [DE# 58-9, p. 1-9; 58-10].

29.    When the news story broke about Milton, Doe spoke with her previous teachers.  The consensus was that they were not surprised as Milton was creepy and would tend to manipulate situations at work. [Exh. C., p. 55, l. 22-25; 26, l. 1-5].  When staff interviewed Milton's wife, she stated she knew her husband was having an affair with a female student. [DE# 58, p. 10/32; 58-1, p. 3/11].  Doe reports significant emotional distress because of the relationship.  She has visited her therapists multiple times and a counselor at school with significant costs. [Exh. C, p. 73, l. 1-6; 74, l. 5-6; 75, l. 5-14].

30.    Doe testified that if the Katy ISD Defendants taken the appropriate steps to stop Milton at any

step along the way, Doe would not have suffered the loss of self-esteem, the significant emotional issues and for the first time in her life, a failed class, noted in her complaint and deposition. [Exh. C, p. 77, l. 10-20; 78, l. 3-10; 79, l. 1-15]. Instead the Katy Independent School District had a pattern, practice and custom of chilling the reporting of allegations of teacher upon student misconduct, of threatening the staff person who made such complaints and if a person persisted in the complaint, would be terminated from their employment.

### IV.  SUMMARY JUDGMENT STANDARD

31.    Doe incorporates by reference the standard of review noted by Defendant and adds the following. The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  In reviewing the evidence it must construe all reasonable inferences in favor of the non-movant. Matsushita Elec. Indus. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  As a review of the facts relative to the operative legal standards noted herein, are not so one-sided in favor of Defendant and the Court should DENY the *Motion For Summary Judgement*.

32.    Such a decision is especially warranted when the *Motion* the Defendant relies upon includes carefully crafted affidavits and excerpted documents from their own files.  In essence, it is their own story, in their own words that they ask this Court to believe.  At the summary judgment stage, the Court should view these excerpts and assertions with a very high degree of caution. In International Shortstop, Inc. v. Rally's Inc., 939 F.2d 1257, 1265-1266 (5th Cir. 1991), as a "cold read" of a motion for summary judgment is generally no substitute for a trial, because it "cannot unmask the veracity of a witness clad in a costume of deception; it

cannot unveil that a seemingly well-groomed witness is coming apart at the seems or that "he fidgets when answering critical questions, his eyes shift from the floor to the ceiling and he manifests all other indicia attributed to perjurers."

33.    In summary, a denial of said *Motion* is also fully in accord with strong public policy sentiments that summary judgment is a drastic remedy, <u>Smoot v. Chicago, R. I. & P., Co.</u>, 378 F2d 879 (10th Cir. 1967) and should be used sparingly, <u>City Nat'l Bank of Fort Smith, Ark. v. Vanderboom</u>, 422 F2d 221 (8th Cir. 1970). This public policy is even more appropriate when dealing with statutes that address civil rights of the litigants and are remedial in nature, like Title IX in this cause.

## V.   <u>SUMMARY OF DEFENDANT'S ARGUMENT AND RESPONSE</u>

34.    The District relies upon a traditional defense that because they had no knowledge of an emotional or sexual relationship between Doe and Milton until after it was reported to them, they cannot be liable for Milton's acts. They rely upon <u>Gebser v. Lago Vista Indep. School District</u>, 524 U.S. 274 (1998) for this proposition. [DE# 58, p. 15/32]. Doe responds that "actual notice" is not controlling when the institution itself is at fault for creating a hostile environment for its female students. *See* <u>Gebser</u> at 290 [distinguishing cases involving official policy as compared to cases holding a school liable for the acts of an individual].

35.    In regard to Plaintiff's allegations that Crowe and other School District Officials had actual knowledge that Milton was involved in a sexual relationship with a female student as early as 2002, they argue it could not put a school district on notice of misconduct, because the allegations against Milton in 2002 were not specific enough to put them notice of the harassment that started a decade later. They cite case after case for this proposition. In

response Doe notes that if the mere rumor in 2012 of Milton being alone with a female student in his classroom triggered a duty to report and initiate a police department and separate school district investigation, then certainly the same allegations by Colopy coupled with a significant quantum of other allegations of misconduct by Milton, certainly defeats this argument by the District. Moreover, they argue "excessive time elapsed between the old rumors and the current allegations," relying upon only one case, P.H. v. School District of Kansas City, Missouri, 265 F. 3d 653 (8th Cir. 2001), for this proposition. [DE# 58, p. 27- 28]. As Plaintiff will more fully discuss below, Doe's case is readily distinguishable.

36.     The District also argues correctly, that Plaintiff's request for punitive damages, is incorrect. [DE# 58, p. 28- 29].  Last, in Plaintiff's *Third Amended Complaint* [DE# 38, ¶127, 155, 158] she pled she was deserved of not only damages for violations of her rights under Title IX but for the provision of and/or reimbursement of compensatory and remedial services, as well. In her *Response* to the District's 12(b)(6) *Motion To Dismiss* she argued that even if the District was not liable for damages, they nonetheless, had a duty to remedy the effects of the harassment she experienced. [DE# 44, ¶91- 92].  The District did not address this issue.

## VI.  ARGUMENT AND AUTHORITIES

37.     Plaintiff incorporates by reference any and all of the above-noted paragraphs and each paragraph  below, incorporates by reference those above it.

A.     THE DISTRICT SUPPORTS A CULTURE OF A CONSPIRACY OF SILENCE AND PUNISHES THOSE WHO SPEAK UP

38.     Before Doe turns to her legal arguments she believes it is important to both reiterate and crystallize the following facts-  that over the course of a decade staff member after staff member after staff member who either observed or heard about Milton's misconduct, failed

to do anything about it, or if they did, their complaints were buried.  In 2001 when Kelly (Booth) Colopy attempted to complain about teacher misconduct to Assistant Principal Mary Jane Crowe, she quickly learned such complaints were disfavored.  Later when she saw Milton running after a female student in his classroom and "playing grab ass" she was too scared to bring it up to Crowe.  Kevin Colopy observed Milton spending time in his classroom alone with a female student and he too attempted to tell Crowe and like Kelly, was told to drop the subject and if he did not would be fired.

39.    Undeterred Kevin told "everyone."  He specifically remembers telling Kelly, his mother (a teacher there as well), Dorothy Madinka, a photography teacher and Mickey Trainer a Department Chair.   Yet, not one of these staff members  made a complaint or if they did, it too was buried.  Later Colopy saw Milton and the student in an embrace and told another teacher.  This teacher did not make a complaint or if he did, it too was buried.  Milton's wife, also a teacher with the District was told everything.  Colopy filed a complaint with an Administrator for Substitute Teachers, and this too went nowhere.  Many staff saw the female student wearing Milton's clothing and that too apparently did not trigger an investigation. Finally, one day Colopy could take the silence no longer and walked into a room where Milton and a number of teachers were, and called him a pedophile.  Apparently, none of these many teachers made a complaint or if they did, it too was buried.  To further the cover up Milton was transferred to the Katy High School with absolutely nothing in his employment record that went with him, including these numerous allegations of misconduct, allegations sexual impropriety, allegations of embezzlement or any comment about presenting an art piece of a woman without a head.   Not surprisingly, he continued in his ways.  A few years later in

2010 another teacher filed a complaint about Milton.   Without the benefit of an employment

record showing what happened at the Mayde High School, this complaint too went nowhere.

At this point well over a dozen teachers and a number of administrators were on notice that

Milton was likely guilty of not just misconduct, but sexual misconduct as well, but nothing

was formally investigated. Doe's argument that there was a hostile environment in addressing

sexual harassment is surely strengthened.

40.    Finally in 2012, a teacher told a librarian who told a secretary that Milton was doing the very

same thing that Colopy had complained about a decade earlier, spending time alone in his

room with a female student. The librarian had apprehension about reporting and told the

secretary not to tell anyone, but the secretary did tell boss, the School Principal.  She not only

knew what was the right thing to do but obviously was not worried about losing her job. As

we know the District Police completed an investigation as did the District Human Resource

Department without any findings that Milton misbehaved. Of course, if the Police or Human

Resources Department had the benefit of a record of Milton's behaviors at the Mayde High

School, or allegations of misconduct from 2010, the results would surely have been different.

The District  now trumpets the fact this investigation occurred as evidence there could not be

a hostile environment regarding sexual harassment.  Actually the fact a police and district

investigation ensued upon a mere rumor, supports Doe's argument that all the previous

complaints about Milton evidencing significantly more misconduct, including sexual

improprieties, should have likewise been investigated except for a culture that thwarted the

required reporting.  Surely the failure to do so evidences institutional deliberate indifference.

So later, when a teacher saw Milton using hand gestures to simulate sexual intercourse with

Doe, she too failed to report such conduct to school officials, the District can be said to be deliberately indifferent as to Doe, even if they never received actual notice of the sexual relationship between her and Milton.

B.    ABOUT TITLE IX

41.    The Educational Acts of 1972 passed through Congress as Public Law No. 92-318, 86 Stat. 235 (June 23, 1972) and codified at 20 U.S.C. sections 1681 through 1688.  It is commonly known as "Title IX" and states (in part) that:

> "No person in the United States shall, on the basis of gender, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving federal financial assistance."

It is intended to remedy the effects of discrimination based upon sex and gender. Moreover it is to assure that a student is not a victim of bullying, harassment, sexual harassment, assault or sexual assault because of their membership in a protected class.  Doe claims that the fact the District created an environment that inhibited the reporting of such abuse and punished persons who made such reports, thereby creating a hostile environment for female students like herself, which constitutes actionable sexual harassment under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681 — 1688. Section 1681(a).

42.    A Title IX Defendant is sometimes referred to as a "funding recipient" because their liability is based on their receipt of federal funds. Davis as Next Friend LaShonda D. v. Monroe County Bd. of Educ., 526 U.S. 629, 641, 119 S. Ct. 1661, 143 L. Ed.2d 839 (1999). It is undisputed that the Katy Independent School District receives federal financial assistance, and is a funding recipient. As such, the District may be liable for subjecting its students to discrimination when deliberately indifferent to known acts of teacher-on-student sexual

harassment and the harasser is under the school's authority. Id. at 646-47, 119 S.Ct. 1661.

43.     A recipient will be deemed deliberately indifferent to acts of teacher on-student harassment when the recipient's response to the harassment is "clearly unreasonable in light of the known circumstances." Id. at 648, 119 S. Ct. 1661.  In other words, when a recipient knows of acts of harassment, and is aware of a substantial risk of teacher-on-student harassment, the recipient must exercise means of control available to it to eliminate the risk.  If a recipient fails to exercise available means of control, or exercises those means in a way that is "clearly unreasonable," then the recipient can be seen as having been deliberately indifferent to the risk and has made an official decision to permit the risk to continue.

44.     Doe must address four factors to state a claim under Title IX.  First, that the District (1) had actual knowledge of and (2) was deliberately indifferent to the harassment she experienced, (3) and that the harassment was so severe, pervasive and objectively offensive that it (4) deprived her of access to the educational benefits or opportunities provided by the school. This rule imposes liability only on those school districts that choose to ignore Title IX's mandate for equal educational opportunities.  Id. at 1246 *citing* Davis, 119 S. Ct. at 1671-72. That is, the deliberate indifference must cause a student to undergo harassment or make them liable or vulnerable to it.  Id. at 644-45, 119 S. Ct. 1661.

45.     It is uncontroverted that Doe is a female, that she was sexually harassed by Milton, that such sexual contact is considered severe and pervasive and she experienced a deprivation of educational opportunities because of the harassment.  The battleground is over whether or not the District could be held to be deliberately indifferent to Doe as they were not on actual notice of the relationship between Doe and Milton.

C.    DOE HAS PROVIDED A CONTESTED ISSUE OF MATERIAL FACT THAT THE PRACTICES AND CUSTOMS OF THE DISTRICT THWART THE REPORTING OF TEACHER UPON STUDENT MISCONDUCT AND PUNISH THOSE WHO DID, CREATED A HOSTILE EDUCATIONAL ENVIRONMENT FOR DOE

46.    The District is incorrect when stating it can only be liable if they knew Doe as being sexually harassed by Milton. No circuit has ever interpreted the Gebser actual notice requirement to require notice of the prior harassment of the Title IX plaintiff herself. *See* Escue v. N. Okla. College, 450 F.3d 1146, 1154 (10th Cir. 2006)["Although Gebser makes clear that actual notice requires more than a simple report of inappropriate conduct by a teacher. . . the actual notice standard does not set the bar so high that a school district is not put on notice until it receives a clearly credible report of sexual abuse from the plaintiff-student."];  Baynard, v. Malone, 268 F.3d 228, 238 n. 9 (4th Cir. 2001)["We note that a Title IX plaintiff is not required to demonstrate actual knowledge that a particular student was being abused."].  In summary, the Katy ISD is liable to Doe for the harassment she experienced at the hands of Milton, even if they were not on specific notice of the relationship.

47.    In Hernandez v. Baylor Univ., 2017 U.S. Dist. LEXIS 54255* (W.D. Tex., April 7, 2017) the Honorable Judge Robert Pittman, wrote an opinion on this topic. He went through the traditional analysis of a Title IX claim, Id. at *11-*12, as the Katy ISD does in this case. The Judge found there were two types of claims. First, was a traditional claim referred to as a "post-reporting claim," and the second claim the Court called a "heightened-risk claim." Id. at *12-*13. The Court described heightened-risk claims as having actual notice of a threat to female students in general and being deliberately indifferent to it, thus creating a heightened vulnerability to sexual assault for female students. Id. at fn. 2 *citing* Williams v. Bd. Regents Univ. Sys. Ga., 477 F.3d 1282, 1296 (11th Cior. 2007). While using different terminology, this

analysis follows the reasoning used in Simpson v. University of Colorado and Doe v. University of Tennessee, 181 F. Supp. 3d 788 (M.D. Tenn., May 3, 2016)[adopting the reasoning in Simpson but calling these institutionally based deliberate indifference claims as a "Before Claim"].

48.   The Court held that vulnerability, this *heightened risk*, does plausibly constitute harassment under Title IX. Hernandez at *20. An institution will not be liable for damages "unless its deliberate indifference 'subject[s]' its students to harassment"; to "subject" a student to harassment, all the school has to do is make the student vulnerable to that harassment. Id. at *18 (citing Davis, 526 U.S. at 644-45). Hernandez alleged among other things that Baylor had knowledge of at least six previous assaults that were committed by her assailant against other female students yet failed to perform any protective measures. Hernandez at *17-*18. The Court reasoned that Baylor's alleged failure to address sexual violence committed by its football players, including Hernandez's assailant, and its discouragement of reporting, active concealment was a form of discrimination. Id. at *19-20. It further reasoned that Baylor's alleged knowledge of the need to protect the female student body and supervise the assailant plausibly constitutes deliberate indifference, and thus plausibly created an environment in which the assailant could sexually assault women without consequences. Id. at *20.

49.   Here, the Katy ISD officials were well aware of Milton's inappropriate relationships with the female students over the course of many, many years. Instead of fulfilling the requisites of well-settled Title IX Jurisprudence, to investigate allegations of teacher upon student misconduct and both address and remedy the effects of the harassment, the School District did absolutely nothing, Davis at 654, 1676, absolute evidence of deliberate indifference.

50.     Moreover, even though the District had knowledge of Milton's inappropriate relations with Jackie, he was nevertheless permitted to transfer to Katy High School in the District without anything in his personnel file about his misconduct, sexual relationship with a student, allegations of embezzlement or violent art work objectifying woman. Allowing Milton to transfer without any consequences created a *heightened risk* for female students in the future, including Doe. *See* Simpson at 1185 [failure to provide adequate supervision and guidance could "reasonably be said to have been deliberately indifferent to the needs of female students]; *see also* Williams v. Bd. of Regents of the Univ. Sys. of Ga., 477 F.3d 1282 (11th Cir. 2007)[an institution acts with deliberately indifference when failing to adequately supervise a person who was the object of a complaint].  Worse yet, Crowe and other staff actively and purposefully discouraged staff members from reporting allegations of teacher misconduct in general, and the misconduct of Milton in particular.  What makes them even more blameworthy is Staff actively retaliated against Colopy, for stating his concerns.  In the creation of this hostile environment, not only was the District merely deliberately indifferent, they were absolutely intentionally and purposefully indifferent. *See* Gonzalez v Yseleta Indep. Sch. Dist., 996 F.2d 745, 761 (5th Cir. 1993)[recognizing different levels of scienter between deliberate indifference based upon inaction as compared to deliberate indifference based upon purposeful acts to condone, acquiescence behaviors or to thwart reporting], *quoting* Jones v. City of Chicago, 856 F.2d 985, 992-993 (7th Cir. 1988).

D.      THE ISSUE AS TO WHETHER OR NOT THE PREVIOUS ACTS OF MISCONDUCT BY MILTON WAS NOT SUFFICIENT TO PUT THE DISTRICT ON NOTICE FOR THE SEXUAL HARASSMENT OF DOE IS BEST LEFT FOR A JURY

51.     The District also finds support for the contention they could not be held deliberately

indifferent because they completed an investigation of Milton in 2012 and the investigation determined there was not an inappropriate relationship between the student and Milton.

52.   First, Doe has presented summary judgment evidence the District has a long history of chilling the reporting of teacher upon student misconduct and punishing those who make such reports.  They should not be able to benefit from this culture of suppression and then claim "no notice" when there are significant facts in evidence that they did their best to assure "no notice" occurred.  In Doe v. School Board of Broward County, Florida, 604 F.3d 1248 (11th Cir. 2010) the Court wrote "we do not find it determinative that an investigation was ultimately inconclusive ... The simple fact that these prior incidents were unconfirmed "cannot as a matter of law" absolve the School Board of Title IX liability." As we know, the Court's must look at the totality of the circumstances.

53.   Second, the District provides a litany of cases that promote the theory the types of misconduct alleged against Milton from 2002 up to 2014, could not have put them on notice that he would have sexual contact with Doe in 2014.  This specific position has been rejected in Williams v. Bd. of Regents of the Univ. Sys. of Ga., where the Court held in a Title IX student-on-student harassment case that the plaintiff sufficiently alleged actual notice against the institution even if the primary substance of that notice differed significantly from the circumstances of the plaintiff's harassment.  That is because lesser harassment may still provide actual notice of sexual conduct, for it is the risk of such conduct that the Title IX recipient has the duty to deter. Of course, Doe reasonably believes that when Kevin Colopy called Milton a pedophile and Assistant Principal Crowe and the Administrator who terminated Colopy's employment based upon this "pedophile" statement, was surely on

sufficient notice.

E.     THE ISSUE OF WHETHER OR NOT TOO MUCH TIME HAS PASSED BETWEEN THE COMPLAINTS OF Colopy AND THE SEXUAL HARASSMENT OF DOE BY MILTON, IS AN ISSUE BEST LEFT FOR A JURY

54.     The Defendant's cite <u>J.P. v. School District of Kansas City, Missouri</u>, 265 F.3d 653 (8th Cir. 2001) for the proposition that too much time has passed between Colopy's reporting and Doe's outcry. This case is easily distinguished. First, in that case, the Court was looking at allegations of potential sexual abuse by a teacher occurring in a different school in 1978 and determined that such rumors could not put the Kansas City School on notice of sexual abuse occurring in 1995 through 1997, especially as that District did not receive actual notice of the abuse until early 1998, about a twenty-year difference.

55.     In that case, the Court was looking a claim with one teacher and one student, the typical "after claim."  In this case we are addressing institutional deliberate indifference the "before claim," which lends itself to a longer span of time. *See* <u>Doe v. University of Tennessee</u>, 181 F. Supp. 3d 788 [where School was on notice as early as 1995 it was responsible for hostile environment for assaults occurring 20 years later in 2015].  In addition, the J.P. case does not have as its component the purposeful coverup of the complaints, as has occurred in this case, making the District's even more culpable. <u>Gonzalez v Yseleta Indep. Sch. Dist</u>. In any case, the issue of whether or not the lapse of time between the District having significant knowledge of Milton's misconduct, and his harassment of Doe about a decade letter, cannot "as a matter of law," be dispositive.  As such, it too is a contested issue of material fact and is best left for a jury to determine.

F.     DOES HAS PRESENTED ARGUMENT THAT THE DISTRICT FAILED TO REMEDY THE EFFECTS OF THE HARASSMENT SHE EXPERIENCED

56.     As noted above, Plaintiff has argued that even if the District is not liable for damages, they have a duty to remedy the effects of the harassment she experienced. [DE# 44, ¶91- 92], *citing* Vance v. Spencer Cnty. Pub. Sch. Dist., 231 F3d 253, 261 (6th Cir. 2000); K.M. Ex el D.G. v. Hyde Park Central School District, 381 F. Supp.2d 343, 348 (S.D. N.Y. 2005); D.A. v. Meridian School District No. 2, CA 1:11-cv-000119-CWD (D.C. Idaho, Feb. 12, 2013). The District did not address this issue and as such, has waived argument. L&A Contracting v. Souther Concrete Services, 17 F.3d 106, 113 (5th Cir. 1994), *see also* Audler v. CBC Innovis Inc., 519 F.3d 239 (5th Cir. 2008)["A party waives an issue if he fails to adequately brief it."] and as such Defendant's *Motion For Summary Judgment* may be denied, as to this claim.

## VII.  CONCLUSION AND PRAYER

When briefs present multiple versions of the facts, it arouses a Court's attention because multiple versions of the facts increase the chances some of those conflicting facts will be material to the outcome of the case.  This Court must review the facts stated in the light most favorable to Doe, noting where appropriate conflicting facts presented by the moving party.  Pourghoraishi v. Flying J, Inc., 449 F.3d 751 (7th Cir. 2006) *citing* Anderson v. Liberty Lobby Inc. In the instant case the District provides evidence in support of their position they were not deliberately indifferent by responding and completing an investigation of Milton in 2012 based upon allegations he was in a room alone with a female student.  In contrast the District alleges that this very same set of facts (and worse) is not sufficient to show they were deliberately indifferent when not responding in 2002.  As the District itself presents conflicting facts their *Motion* should be denied.

**WHEREFORE PREMISES CONSIDERED**, Plaintiff Doe prays that Defendant's *Motion*

*For Summary Judgment* be denied, in total or in part, that this cause proceed to trial, and for such other and further relief as the Court deems just and proper whether it be in law, in equity, or both.

Respectfully submitted,

Cirkiel & Associates, P.C.

/s/ Martin J. Cirkiel
Mr. Martin J. Cirkiel, Esq.
State Bar No.: 00783829
Fed ID No.  21488
1901 E. Palm Valley Boulevard
Round Rock, Texas  78664
(512) 244-6658 [Telephone]
(512) 244-6014 [Facsimile]
marty@cirkielaw.com [Email]

THE VERDE LAW FIRM, PLLC
Mr. Joshua A. Verde
Attorney-in-charge
State Bar No. 24077590
Fed ID No. 1760723
4600 Highway 6 North, Suite 320
Houston, TX 77084
(713) 909-4347 [Telephone]
(713) 588-2431 [Facsimile]
josh@verde-law.com [Email]

ATTORNEYS FOR PLAINTIFF
JANE DOE

## VIII. <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served upon all counsel of record listed below through the Court's ECF filing system and/or fax on this the 17th day of June 2019.

Mr. Christopher B. Gilbert, Attorney & Counselor At Law
State Bar. No. 00787535
So. Dist. No. 17283
Thompson & Horton LLP
3200 Southwest Freeway
Suite 2000
Houston, TX 77027
(713) 554-6744 [Telephone]
(713) 583-7698 [Facsimile]
cgilbert@thompsonhorton.com [Email]
Attorney In Charge For Katy ISD

Ms. Susan Herbst Soto, Attorney & Counselor At Law
Law Offices of Susan H. Soto
6300 West Loop South
Suite 405
Bellaire, Texas 77401
(866) 402-6433 [Telephone]
(832) 831-9936 [Telephone]
susansotojd@gmail.com [Email]