IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JANE DOE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-17-1060 |
| | § | |
| KATY INDEPENDENT SCHOOL DISTRICT, | § § § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND OPINION

When a high-school teacher and a student have a sexual relationship, it is the stuff of nightmares for school districts, principals, and, of course, parents. This case is no exception. Jane Doe, an 18-year-old high school senior, had an intimate relationship with one of her teachers, Robert Milton. Doe sued the Katy Independent School District, several District employees, and Milton, asserting federal-law claims under 42 U.S.C. § 1983 and 20 U.S.C. § 1681, *et seq.* (Title IX), and a state-law claim for intentional infliction of emotional distress. (Docket Entry No. 1). After multiple motions to dismiss and amended complaints, only the Title IX claim against the District remains.

The District moved for summary judgment that it is not liable under Title IX and, in any event, cannot be required to pay punitive damages. (Docket Entry No. 58). Doe responded, the District replied, and the court heard oral argument on the motion. (Docket Entry Nos. 65, 66, 70). Doe then moved to supplement the summary judgment record, and the court granted the motion with an extension of the discovery deadline to allow the District to respond. (Docket Entry Nos. 71, 77).

Based on the record, the pleadings, motions, arguments, and the applicable law, the court grants in part and denies in part the District's motion for summary judgment. The court denies summary judgment for the District on the Title IX claim because there are genuine factual disputes material to determining the District's knowledge of the risk that Milton would have a sexual relationship with a student. The court grants summary judgment for the District on the punitive damages claim because these damages are not available under Title IX.

The reasons are explained in detail below.

## I. Background

Doe's primary argument on the Title IX claim is that Milton had earlier incidents of a sexual nature with students at District schools that would allow a jury to find that the District knew of, and was deliberately indifferent to, the risk that he posed to female students like Doe. Each incident raised in Doe's amended complaint is described below, drawing the facts from the summary judgment evidence.

### A. "Jackie"

In 2001, Milton was a teacher at Mayde Creek High School, a school in the District. (Docket Entry No. 65 at 3). That fall, art teacher Kelly Booth[1] saw Milton spending time alone with "Jackie,"[2] a female student. (Docket Entry No. 65-A at 10). Jackie wore one of Milton's shirts in art class until the school principal, O.D. Tompkins, told her to remove it. (*Id.* at 12). Booth also saw Jackie wearing Milton's wedding ring. (*Id.* at 13). Booth told other teachers about her concerns that Milton was too close to Jackie, but Booth did not tell Tompkins. (*Id.* at 20). Booth did speak to the Mayde Creek High School assistant principal, Mary Jane Crowe, but Booth

---

[1] Booth is her maiden name; she has since married. Her deposition is taken under the name she has now, Kelly Colopy.
[2] "Jackie" is a pseudonym.

did not describe what she had seen because she did not feel comfortable talking to Crowe. (*Id.* at 19–20). Booth testified in her deposition that she had previously complained to Crowe about a teacher taking students off campus on an unauthorized field trip. (*Id.* at 18). In response, Crowe told Booth "to mind her own business." (*Id.* at 18–19). Booth did not share her concerns about Milton and Jackie with any other District administrator. (*Id.* at 22).

Substitute teacher Kevin Colopy also testified in his deposition that he saw inappropriate behavior between Milton and Jackie. (Docket Entry No. 65-B). Colopy saw Milton eating lunch alone with female students, including Jackie. (*Id.* at 14-15). On one occasion, he saw Milton embracing Jackie from behind. (*Id.* at 10). Colopy told fellow teachers, but he did not report the incident to the Mayde Creek High School principal or assistant principal. (*Id.* at 10–11).

On another occasion, Colopy thought he saw Milton and Jackie embracing in a car. (*Id.* at 12). Colopy talked to assistant principal Crowe, but he gave only a general report that Milton had been "very inappropriate . . . with this young girl." (*Id.* at 14, 27).[3] Crowe told Colopy that Colopy should not make this his business if he wanted a job in the District. (*Id.*).

Colopy also testified that he called the office of the administrator for substitute teachers in the District and made a complaint. (*Id.* at 15, 25). In that call, Colopy described "what [he] witnessed with [Milton] in the classroom with these students." (*Id.* at 15). Colopy could not remember who he spoke to on the phone, and nothing came of the call. (*Id.*). Colopy thought that after his call, Milton's behavior would stop, but he again saw Jackie wearing Milton's sweatshirt.

---

[3] Doe cites to Kevin Colopy's declaration, in which he states that he "reported [his] concerns to other teachers and [District] administrator Crowe." (Docket Entry No. 65-E). The District objects, arguing that the declaration contradicts statements in Colopy's earlier deposition testimony. (Docket Entry No. 66 at 2 n.2). Kevin Colopy's declaration was made after his deposition was taken. "Generalizations that are contradicted by deposition testimony will not prevent summary judgment." *K. S. v. Nw. Indep. Sch. Dist.*, 689 F. App'x 780, 786 (5th Cir. 2017).

(*Id.* at 16). Colopy complained to other teachers, but he did not complain to another District administrator. (*Id.*).

Later, Crowe asked Colopy if he had been talking with other teachers about what he and Crowe had "talked about." (*Id.*). Crowe implied that talking about Milton meant that Colopy no longer wanted to work for the District. (*Id.*). Colopy became frustrated and walked to Milton's classroom, where he called Milton a "[expletive] pedophile." (*Id.* at 16–17). Because the classroom doors were open, Colopy assumed that his accusation might have been heard by around a hundred teachers and students. (*Id.* at 17, 23). Colopy testified that no District administrators were present, but he believed that they were "aware of it" because he was terminated as a substitute teacher shortly afterwards. (*Id.* at 23–24). Doe alleges that when Milton was later transferred to Katy High School, it was without any record of Kevin Colopy's complaint. (Docket Entry No. 65 at 22).

Principal Tompkins testified in his deposition that he never heard about anything improper, including about a sexual relationship, involving Milton and a student. (Docket Entry No. 58-H at 79). Tompkins testified that Milton's transfer from Mayde Creek High School to Katy High School was Milton's choice, and at the request of Katy High School's assistant principal. (*Id.* at 58; *see also* Docket Entry No. 78-M; Docket Entry No. 78-N). Tompkins was asked whether the transfer decision had anything to do with "the mess"[4] in the Mayde Creek High School art department. (Docket Entry No. 58-H at 58). He testified that he could not say if that was the reason. (*Id.*).

---

[4] The District provides selections from Tompkins's deposition testimony, making it difficult to ascertain from the record provided what mess the attorneys are referring to.

### B. Four Unidentified Female Students

After leaving Mayde Creek High School, Milton worked at Katy High School as an art teacher. (Docket Entry No. 65-C at 9–10). Katy High School Spanish teacher Geir Bentzen testified in his deposition that on one occasion in 2010, four female students told him that "Milton touched them during art class and that they were uncomfortable." (Docket Entry No. 58-G at 10).[5] While he could not recall specifics, Bentzen testified that "[Milton] touched them [on their] shoulders and neck," and "they were upset about it." (*Id.* at 11–12). Bentzen testified that because he believed he was required to report what the students told him, he believes he contacted Katy High School assistant principal Scott Rounds, but Bentzen was uncertain. (*Id.* at 12–13). When asked again, Bentzen testified that it was "more likely than not" that he had reported what the students had told him about Milton touching them. (*Id.* at 20, 25). Bentzen also testified that he believed Rounds found fault in whatever Bentzen did or said. (*Id.* at 21). Rounds testified in his declaration that "Geir Bentzen never made any reports to [him] about any kind of inappropriate conduct by Robert Milton, whether towards female students or anyone else." (Docket Entry No. 58-E at 1).

### C. "Becky"

In 2012, a former Katy High School librarian, Robin Cashman, told the school secretary, Debbie Davis, about a rumor that Milton was having lunch alone every day with a female student, "Becky."[6] (Docket Entry No. 58-D at 1). Davis relayed this report to the Katy High School principal, Steve Robertson. (*Id.*). Robertson checked the school security cameras and confirmed

---

[5] Doe attaches Bentzen's declaration to her response in opposition to the motion for summary judgment. The District objects, arguing that the declaration contradicts statements in Bentzen's earlier deposition testimony. (Docket Entry No. 66 at 2 n.3). Bentzen's declaration was made after his deposition was taken. "Generalizations that are contradicted by deposition testimony will not prevent summary judgment." *K. S.*, 689 F. App'x at 786.

[6] "Becky" is a pseudonym.

that Becky was going to Milton's classroom alone during her lunch hour. (*Id.*). Robertson reported this to Debbie Harris, the District's assistant superintendent for human resources. (*Id.*). The District placed Milton on administrative leave pending investigation. (*Id.*).

District police officers and District administrators also investigated Milton's relationship with Becky. (*Id.* at 2). A District police officer talked to Lisa Matschek, a substitute teacher, who confirmed that Becky regularly ate lunch in Milton's classroom. (*Id.* at 12). This officer also spoke to Laura Anne Williams, a Katy High School art teacher, who said that Becky had "concerning" drawings, one of a nude female and another of a young girl sitting on a man's lap. (*Id.* at 13). Williams did not believe that Becky had made these drawings. (*Id.*).

District police officers and District administrators both interviewed Becky. (Docket Entry No. 58-D at 2). Becky denied anything inappropriate between her and Milton. (*Id.*). Becky told District police that she had asked Milton if she could work in his classroom during lunch, and Milton had told her that his classroom was always open to students. (*Id.*). Becky stated that she was "nothing more than a student to [Milton] and he [was] nothing more than a teacher to [her]." (*Id.* at 2-3). Becky provided the District police with the art book from which she had copied the "concerning" drawings. (*Id.* at 14–15). The District police concluded that concerns about Milton's behaving inappropriately with Becky were "unfounded." (*Id.* at 16).

The District administrators similarly found no evidence of an inappropriate relationship between Milton and Becky. (*Id.* at 3). The District provided Milton with a written memorandum of the investigation result and directions for future performance and protocol. (*Id.*). Robertson testified that he had no similar problems with Milton until 2014, when Robertson left Katy High School to become the District's assistant superintendent for secondary school leadership and support. (*Id.* at 3).

### D. Jane Doe

Jane Doe attended Katy High School and graduated in 2015. (Docket Entry No. 65-C at 7). Doe joined the National Art Honor Society as a freshman, where she met Milton, who served as an advisor. (*Id.* at 10). During Doe's junior year, Milton would make sexual jokes and innuendoes around her. (*Id.* at 15–16). Doe took Milton's art history course in her senior year. (*Id.* at 10). In the fall of 2014, Doe turned 18. (*Id.* at 17). Milton began sharing intimate details about his personal life and marriage and encouraging Doe to make nude paintings of herself. (*Id.* at 17–18). In April 2015, Milton and Doe began a sexual relationship. (*Id.* at 19).

Milton would leave notes for Doe at school, where they communicated often. (*Id.* at 24–27). During school hours, Doe spent much of her time with Milton, painting, talking with him, and kissing and touching in Milton's classroom closet. (*Id.* at 24–28). Doe told a fellow student about the relationship, but neither Doe nor the student told a teacher or a school administrator. (*Id.* at 21–22). Doe testified that she thought Natalie Rodriguez, another art teacher, had detected their relationship because of Milton's actions towards Doe while in Rodriguez's presence, but Doe did not talk to Rodriguez about it. (*Id.* at 22–24).

The sexual relationship continued throughout the summer of 2015. (*Id.* at 31). Doe graduated that May, and then went on a class trip to Europe that Milton led. (*Id.* at 31–32). In the fall of 2015, Doe moved to Georgia to attend college, but she remained in contact with Milton. (*Id*. at 30). The two met during Doe's holiday break in Texas, and Milton visited Doe in Georgia during her spring break. (*Id.*). When Doe returned to Texas in the summer of 2016, she broke off the relationship with Milton and told her mother about what had occurred. (*Id.* at 29).

On July 6, 2016, Doe's mother called Rick Hull, the Katy High School principal, told him that Doe and Milton had been in a sexual relationship while Doe was a student, and asked for a

7

meeting. (Docket Entry No. 58-A at 2). Hull scheduled the meeting for July 8 and notified the District's human resources office and the District's police department about the allegation. (*Id.*). On July 8, Doe and her father; Rick Hull, the Katy High School principal; Andrea Arthur, the District's employee relations coordinator; and Sergeant J.C. Moyer from the District police department, met and discussed the relationship. (*Id.* at 3). Milton was leading a trip to Europe with students, and the District directed him to return. (*Id.*). The District put Milton on administrative leave pending investigation. (*Id.* at 8). When Milton returned from Europe, he was interviewed by Hull, Arthur, and the District's assistant superintendent, Lee Crews. (*Id.* at 3). Milton admitted to having a sexual relationship with Doe while she was still a student. (*Id.*). He resigned from the District. (*Id.* at 4). On July 28, Milton was arrested and charged with improper relationship with a student, a second-degree felony. (Docket Entry No. 58-I). Milton pleaded guilty. (Docket Entry No. 58-J).

After multiple motions to dismiss and amended complaints, the Title IX claim remains. The District seeks summary judgment as to this claim. After the court heard oral argument on the motion, Doe moved to supplement the summary judgment record with declarations from Jackie and her uncle, Brian Moorhead. (Docket Entry No. 71). The court granted Doe's motion and gave the District time to supplement its record in response. (Docket Entry No. 77). The District filed a supplemental reply brief, and Doe responded. (Docket Entry Nos. 78, 79). The arguments are analyzed below.

## II.     The Legal Standard for Summary Judgment

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd on Behalf of Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir.

2019) (quoting FED. R. CIV. P. 56(a)). "A material fact is one that might affect the outcome of the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 610 (5th Cir. 2018) (quotations omitted). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating'" that "there is an issue of material fact warranting trial.'" *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). The moving party must demonstrate the absence of a genuine issue of material fact, but it need not negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). "If the moving party fails to meet [its] initial burden, [the summary judgment motion] must be denied, regardless of the nonmovant's response." *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v.*

9

*Ashford Place Apartments L.L.C.*, 914 F.3d 940, 946 (5th Cir. 2019). In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La, L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014)).

## III. Analysis

### A. The Summary Judgment Evidence

The District submitted the following summary judgment evidence:

- Katy High School principal Rick Hull's declaration, including the email he sent following Doe's mother's call, the notice sent to the Texas State Board of Educator Certification, and the final human resources department report;

- Katy High School human resources coordinator Andrea Arthur's sworn statement;

- District assistant superintendent Lee Crew's sworn statement;

- former Katy High School principal Steve Robertson's declaration, including materials on the 2012 investigation of Milton;

- former Katy High School assistant principal Scott Rounds's declaration;

- excerpts from Jane Doe's deposition;

- former Katy High School Spanish teacher Geir Bentzen's deposition;

- excerpts from former Mayde Creek High School principal Obra D. Tompkins's deposition;

- Milton's arrest documents;

- Milton's order of deferred adjudication;

- excerpts from former Mayde Creek High School art teacher Kelly Booth's deposition; and

- excerpts from former Mayde Creek High School substitute teacher Kevin Colopy's deposition.

(Docket Entry Nos. 58-A–58-L). In response, Doe submitted:

- Kelly Booth's deposition;

10

- Kevin Colopy's deposition;

- Jane Doe's deposition;

- Geir Bentzen's declaration; and

- Kevin Colopy's declaration.

(Docket Entry Nos. 65-A–65-E).

Doe's supplemental record evidence consists of declarations from Jackie and her uncle, Brian Moorhead. (Docket Entry No. 71). Moorhead testified that Jackie lived with him in 2001 while she was a student at Mayde Creek High School. (Docket Entry No. 71-2 at 2). Moorhead testifies that he discovered inappropriate "love letters" from Milton to Jackie that "discussed things like how [Milton] wanted to be 'more than a big brother' to her and how Milton got butterflies in his stomach when he saw Jackie at homecoming." (*Id.*). Based on the letters, Moorhead told Mayde Creek High School principal Tompkins that he suspected an "inappropriate, sexual relationship" between Milton and Jackie. (*Id.*). Jackie reiterated her uncle's testimony. (Docket Entry No. 71-1). She testified that she knew her uncle spoke to Tompkins because her uncle told her he had done so, and because Milton then told her that Tompkins "forced him to transfer schools because of [her] uncle's report." (*Id.* at 2–3).

The court allowed the District to supplement its summary judgment motion with additional depositions of Jackie and Moorhead. (*See* Docket Entry No. 77). The District submitted only an excerpt from Tompkins's prior deposition testimony, describing how Milton was transferred to the Katy High School because of a request from that school. (Docket Entry No. 78-M). In the deposition testimony already submitted, when Tompkins was asked about Moorhead, Tompkins testified that he did not "remember that at all." (Docket Entry No. 58-H at 60–61). The District

11

also submitted a "Transfer Recommendation" form showing that Milton was transferred from Mayde Creek High School to fill a vacancy at Katy High School. (Docket Entry No. 78-N).

### B. The Title IX Claim

Doe alleges discrimination against her in violation of Title IX because the District had actual knowledge of "Milton's abusive and predatory proclivities, his preying upon the emotional frailties of young female students . . . and the risk posed to young female students like Doe," and was deliberately indifferent to that risk. (Docket Entry No. 38 at ¶ 153). The District argues that summary judgment is appropriate because the incidents in earlier years did not make an appropriate District employee aware of the sexual harassment, or an appropriate District employee investigated and reasonably found an insufficient basis for further action. (Docket Entry No. 58 at 9). The District argues that both preclude a finding of deliberate indifference. (*Id.*).

A school district may be liable under Title IX if it has "actual knowledge of discrimination in [its] programs and [fails] adequately to respond." *Lozano v. Donna Indep. Sch. Dist.*, 648 F. App'x 412, 413 (5th Cir. 2016) (quoting *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998)). A plaintiff must allege and prove that "(1) a school district employee with supervisory power over the offending teacher (2) had actual notice of the abuse and (3) responded with deliberate indifference." *King v. Conroe Indep. Sch. Dist.*, 289 F. App'x 1, 4 n.3 (5th Cir. 2007). Actual knowledge is a question of fact, but if facts are undisputed, summary judgment may be appropriate. *Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 384 (5th Cir. 2000).

An employee has supervisory power if he or she is "(1) invested by the school board with the duty to supervise the employee and (2) had the power to take action that would end such abuse." *A.W. v. Humble Indep. Sch. Dist.*, 25 F. Supp. 3d 973, 983(S.D. Tex. 2014), *aff'd sub nom. King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754 (5th Cir. 2015) (quoting *Gebser*, 524 U.S. at 280);

*see Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 660 (5th Cir. 1997). Knowledge of teacher-student harassment by a school district employee who has no authority beyond reporting the misconduct to other school district employees is insufficient to expose the school district to Title IX liability. *Rosa H.*, 106 F.3d at 660. Supervisory authority is not present in "the bulk of employees, such as fellow teachers, coaches, and janitors, unless the district has assigned them both the duty to supervise the employee who has sexually abused a student and also the power to halt the abuse." *Id.* at 660.

To raise a factual dispute as to actual knowledge, a plaintiff "need not show that the district knew that a particular teacher would abuse a particular student." *Id.* at 659. It is enough that "the school district failed to act even though it knew that [the teacher] posed a substantial risk of harassing students in general." *Id.* A school district may not be found liable if it shows that it (1) "did not know of the underlying facts indicating a sufficiently substantial danger and that [it was] therefore unaware of a danger," or (2) "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." *Id.* The test is whether the district had "either actual knowledge of the precise instance of abuse giving rise to the case at hand, or actual knowledge of substantial risk that such abuse would occur." *A.W.*, 25 F. Supp. 3d at 992.

A district with knowledge may be found liable when it was deliberately indifferent to the teacher-student harassment. *See Ramos v. Webb Consol. Indep. Sch. Dist.*, 724 F. App'x 338, 339-40 (5th Cir. 2018); *Gebser*, 524 U.S. at 290. The district's conduct "must amount to an intentional choice, not merely an unintentionally negligent oversight." *Ramos*, 724 F. App'x at 340 (quoting *James v. Harris Cty.*, 577 F.3d 612, 617-18 (5th Cir. 2009)). Deliberate indifference is a "high bar." *E. M. ex rel. J. M. v. Austin Indep. Sch. Dist.*, 770 F. App'x 712, 713 (5th Cir. 2019) (quoting

13

*Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.,* 647 F.3d 156, 167 (5th Cir. 2011)). Negligence or unreasonableness is not enough. *Id.* School districts may avoid liability under a deliberate indifference standard by responding reasonably to a risk of harm, even if the response is unsuccessful. *Ramos*, 724 F. App'x at 340 (citing *Dallas Indep. Sch. Dist.*, 220 F.3d at 384). What makes a response or a remedial action "reasonable" depends on the facts of each case. *Dallas Indep. Sch. Dist.*, 220 F.3d at 384. When the material facts are undisputed, "[w]hether an official's response to actual knowledge of discrimination amounted to deliberate indifference . . . may appropriately be determined on summary judgment." *I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 370 (5th Cir. 2019) (quoting *Dallas Indep. Sch. Dist.*, 220 F.3d at 387).

The parties agree that the District had no knowledge of the relationship between Milton and Doe until after Doe graduated and ended the relationship. (*See* Docket Entry No. 58 at 10; Docket Entry No. 65 at 17–18). Doe argues that because of the earlier incidents involving Milton, Jackie, the four students, and Becky, the District "can be said to be deliberately indifferent to [the risk of harm to] Doe, even if [the District] never received actual notice of the sexual relationship between her and Milton." (Docket Entry No. 65 at 18). Doe argues that a jury should determine whether the earlier incidents of Milton's misconduct were enough to give the District the necessary notice of the risk Milton posed to meet the deliberate indifference standard. (*Id.* at 22).

Doe has submitted summary judgment evidence raising genuine factual disputes that preclude summary judgment. Factual disputes are present as to whether the District was aware of Milton's behavior with Jackie. The parties have submitted conflicting deposition and declaration testimony that shows genuine factual disputes material to determining whether Moorhead reported his concerns about Milton's behavior with Jackie to a District employee who had supervisory authority over Milton.

14

The District argues that it is entitled to summary judgment as a matter of law because "vague and conclusory allegations are insufficient to place the District on notice of sexual harassment for purposes of Title IX." (Docket Entry No. 78 at 3). In *Gebser*, the Supreme Court affirmed the grant of summary judgment for the school district, holding that "inappropriate [sexually suggestive] comments during class . . . was plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student." 524 U.S. at 291. The District cites out-of-circuit cases finding allegations of "improper" conduct to be insufficient. *See Campbell v. Dundee Community Schs.*, 661 F. App'x 884, 888 (6th Cir. 2016) (reports of a coach who texted and called players on their cellphones did not provide notice of a risk of a sexual relationship); *Doe v. Flaherty*, 623 F.3d 577, 585 (8th Cir. 2010) (messages like "OMG you look good today" did not suggest actual sexual misconduct). But these cases, as well as *Gebser*, are distinguishable because they do not involve a report to a supervisory employee of a possible sexual relationship between a teacher and a student based on specific communications between them.

The District also cites *Doe v. St. Francis School District*, 694 F.3d 869, 872 (7th Cir. 2012), in which the Seventh Circuit held that "to know that someone suspects something is not to know the something and does not mean the something is obvious." This is somewhat different than the Fifth Circuit standard for knowledge. *See Rosa H.*, 106 F.3d at 659 (it is enough "that the school district failed to act even though it knew that [the teacher] posed a substantial risk of harassing students in general"). *St. Francis* is also distinguishable because in that case, the principal who received the allegation of an improper relationship specifically asked the reporting teacher if she thought "there was anything illegal going on and" was told "no." 694 F.3d at 872. Vague allegations that do not include sexual harassment do not put a school district on notice of that risk.

15

*See A.W.*, 25 F. Supp. 3d at 994 (an allegation that a teacher had an "improper relationship" with a student was insufficient to show knowledge of sexual abuse when there was no allegation that it was a sexual relationship). But Moorhead's testimony about his report of Milton's possible sexual relationship with Jackie does not, as the District argues, consist of "vague and conclusory allegations." Moorhead testified that he told Mayde Creek High School Principal Tompkins that he suspected a possible sexual relationship. The District characterizes Milton's letters to Jackie as merely "inappropriate" because no sexual contact is alleged to have occurred until after Jackie left the District. (Docket Entry No. 78 at 3). But Moorhead's testimony describes the letters as vividly describing Milton's sexual desire for his underage student, and Moorhead details how he brought this information to an employee with supervisory authority.

The District also argues that even if the allegations about Milton and Jackie are accepted as true, "they certainly were insufficient to place the administration on notice a decade or more later that Milton might sexually harass or abuse" Doe. (Docket Entry No. 78 at 6). The District relies on *P.H. v. School District of Kansas City, Missouri*, 265 F.3d 653, 662 (8th Cir. 2001), in which the Eighth Circuit held that a "lone allegation of abuse" was too remote to provide actual notice of the risk of sexual abuse over 20 years later. But in *P.H.*, the earlier allegation was investigated at the time it was made and found to be unsubstantiated. *Id.* at 660. Both the teacher and the student denied that anything occurred. *Id.* The Eighth Circuit does not suggest that every earlier allegation, much less one that was ignored and never investigated, would be too remote to provide knowledge.

Some of the evidence Doe submitted does not in itself support an inference that, or raise a factual dispute as to whether, the District had actual knowledge or was deliberately indifferent about Milton and Jackie as needed for Title IX liability. Undisputed record evidence reveals that

16

Mayde Creek High School teacher Kelly Booth did not raise specific concerns about Milton and Jackie to any District employee with supervisory authority. While there are factual disputes as to whether Mayde Creek High School substitute teacher Kevin Colopy complained to the substitute teacher's department, that is insufficient because Doe failed to identify or submit summary judgment evidence that a substitute teachers' administrator was a District employee with "supervisory authority" over a full-time teacher like Milton. But Moorhead's report, in combination with other evidence of available information about Milton's sexual approaches to female students, preclude summary judgment.

The factual disputes include whether Katy High School Spanish teacher Geir Bentzen reported to an appropriate supervisory employee what he heard about Milton from the four unidentified female students. The case law offers weak support for a claim that reports of touching that is not clearly sexual raise an inference of the awareness the Title IX deliberate indifference standard requires. *See Moreno v. McAllen Indep. Sch. Dist.*, No. 7:15-CV-162, 2016 WL 3198159, at *13 (S.D. Tex. June 9, 2016) (allegations of "bizarre behavior," including standing too close to a student or blocking student against the wall, was not sufficient to provide actual notice of a substantial risk of sexual abuse or harassment); *Doe v. Northside Indep. Sch. Dist.*, 884 F. Supp. 2d 485, 497 (W.D. Tex. 2012) (a teacher hugging and giving hip and chest "bumps" to a student, among other improper behavior, was not suggestive of actual notice that the teacher was a child predator or was sexually assaulting the student); *Dale v. White Cty., Ga. Sch. Dist.*, 238 F. App'x 481, 485 (11th Cir. 2007) (described in *Doe v. Sch. Bd. of Palm Beach Cty.*, No. 15-CV-80175, 2015 WL 4698462, at *5 (S.D. Fla. June 2, 2015)) (reports that female students massaged a teacher's feet, the teacher leaned over students to touch and hug students, and the teacher allowed

female students to lie with their heads resting against his outstretched legs were insufficient for actual notice).

The record evidence also reveals that the District responded to the report of a relationship between Milton and Becky by investigating the allegation and by discussing Milton's behavior with him. *See Ramos*, 724 F. App'x at 340; *King*, 289 F. App'x at 4 (a school district was not deliberately indifferent to an allegation of an improper relationship when the principal spoke with the suspected teacher after hearing the allegation and warned the teacher to keep all student relationships professional). However, it is unclear that had the investigating administrators been aware of the reports about Milton and Jackie, or about Milton and the four unidentified female students, they would have reached the same conclusion about Milton's behavior with Becky.

Doe has put forward competent summary judgment evidence that the District knew of a possible sexual relationship between Milton and a female student that, combined with the facts about Doe, raise factual disputes as to deliberate indifference.[7] The District denies that it received this information or that it suffices to support deliberate indifference. There are genuine factual disputes material to Doe's Title IX claim. The court denies the District's motion for summary judgment on Title IX liability.

### C. The Punitive Damages Claim

Doe's third amended complaint includes a request for punitive damages against the District for its "reckless and callous indifference to her Constitutional and Statutory rights." (Docket Entry No. 38 at ¶ 175). The District argues that punitive damages are not available under Title IX.

---

[7] The District objects to Jackie's affidavit, arguing that it contains hearsay. (Docket Entry No. 78 at 1–3). Because the court does not rely on this affidavit in reaching its conclusion that there is a genuine issue of material fact, the court does not reach this issue.

(Docket Entry No. 58 at 24). Doe argues that the District is incorrect, but she cites only to her amended complaint. (Docket Entry No. 65 at 15).

Neither the Supreme Court nor the Fifth Circuit has held that damages are unavailable for claims under Title IX. In *Barnes v. Gorman*, 536 U.S. 181, 185-88 (2002), the Supreme Court held that punitive damages are not available under Title VI and, in dicta, explained that Title IX is modeled after Title VI. Citing *Barnes*, other courts have since held that punitive damages are not available under Title IX. *See Ruvalcaba v. Angleton Indep. Sch. Dist.*, No. 3:18-CV-00243, 2019 WL 2996536, at *5 (S.D. Tex. June 6, 2019), *report and recommendation adopted*, No. 3:18-CV-00243, 2019 WL 2994638 (S.D. Tex. July 9, 2019) (collecting cases under Title IX); *Hauff v. State Univ. of New York*, No. 18-CV-7256, 2019 WL 6498256, at *13 (E.D.N.Y. Dec. 3, 2019). District courts in the Fifth Circuit have also found that punitive damages are unavailable against educational institutions. *See Ruvalcaba*, 2019 WL 2996536, at *5.; *Ayala v. Omogbehin*, No. CV H-16-2503, 2016 WL 7374224, at *4 (S.D. Tex. Dec. 20, 2016).

Punitive damages are unavailable as a matter of law. The District is entitled to summary judgment on this claim.

## IV. Conclusion

The District's motion for summary judgment is granted as to the punitive damages claim, and denied as to the Title IX claim. (Docket Entry No. 58).

SIGNED on December 13, 2019, at Houston, Texas.

_____
Lee H. Rosenthal
Chief United States District Judge